Filed 9/10/15  P. v. Prado CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H039931 |
| Plaintiff and Respondent, | (Santa Clara County<br>Super. Ct. No. C1245319) |
| v. | |
| IGNACIO PRADO, JR., et al., | |
| Defendants and Appellants. | |

A jury convicted defendant Ignacio Prado, Jr., of assault by means of force likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(4))[1] and misdemeanor resisting, delaying, or obstructing an officer (§ 148, subd. (a)(1)).  A gang allegation (§ 186.22, subd. (b)(1)(A)) attached to the assault count was also found true.  The trial court suspended imposition of sentence and placed Prado on formal probation for five years.

The jury convicted defendant Adam Larios of assault by means of force likely to cause great bodily injury (§ 245, subd. (a)(4)) and found a gang allegation (§ 186.22, subd. (b)(1)(A)) true.  The trial court suspended imposition of sentence and placed Larios on formal probation for five years.

Defendants raise essentially the same contentions on appeal, and each expressly adopts the other's arguments.  Defendants maintain that the trial court (1) erred in

---

[1]  Subsequent statutory references are to the Penal Code unless otherwise indicated.

instructing the jury on aiding and abetting without evidence to support those instructions; (2) erred in failing to clarify its aiding and abetting instructions; (3) improperly allowed the prosecution's gang expert to recount "testimonial hearsay" in violation of defendants' rights to confrontation; (4) improperly allowed the gang expert to opine that they acted in association with and for the benefit of a criminal street gang, which was "tantamount to directing a verdict of guilty" on the assault counts; and (5) imposed several unreasonable and/or overbroad probation conditions. We affirm the order of probation as to Prado and modify and affirm the order of probation as to Larios.

## I. Background

San Jose Police Officer Justin Moro was on duty in a marked patrol car on Thanksgiving Day in 2012. He was driving by Plata Arroyo Park around 1:40 p.m. when he saw a group of six to 10 Hispanic males in red, black, and white clothing "punching and kicking" someone who was on the ground and "pinned up against the fence." Moro stopped his patrol car "and started to lay on my air horn." The attackers "continued to punch and kick the person on the ground" so Moro "drove straight up onto the sidewalk onto the grass as I was blaring my air horn." The assailants "finally looked up" and started to run away. The majority ran east and south toward the park exit. Moro saw "a few more working [their] way north" and jumped out of his car to chase them but realized it would be futile. He turned his attention to the victim, who "was yelling 'Hey, they are over here, they are getting away.'" The victim "was . . . yelling [H]ey they are getting away. They are here. And [he] turned back and pointed to the defendants and back and forth pointing to me and following the defendants at a safe distance." "He was yelling those are the two guys that did it and jumped me . . . . He was following them."

Moro "made contact with one of the defendants . . . and started yelling [at him to] stop." The man was later identified as Prado. He was wearing one jacket and carrying three others plus a hat and a T-shirt. His hair was pulled into a ponytail. Prado ignored

2

Moro's commands even after Moro pulled his gun. Moro and Officer Kyle Cardin eventually arrested him.

The victim "was yelling that is the one; that the other one is getting -- pointing to the north where the other defendant was walking north . . . ." Cardin detained the indicated person, who was later identified as Larios. The victim confirmed to Moro that Prado "was one of the guys that jumped me" and Larios "was one of the ones that punched me." At no time did the victim tell Moro he had "stopped the wrong guy." "No," Moro explained, "he was the one, specifically following and pointing at me saying these are the guys."

The victim was Lubin Del Rio. His forehead was lacerated, his nose was bleeding, and his mouth and ears were swollen. He was "shaking and upset" but coherent after the attack. Moro spoke to him before paramedics transported him to the hospital. Del Rio said he rode his bike to the park, where three of a larger group of Norteños approached him. Del Rio "used the word Norteño." He said that one of the three was "pretty intoxicated." That one pointed to Del Rio's hat (which had an "O" on it) and asked if he "claimed ODB."[2] Del Rio said he "didn't claim" and did not want any problems. The man threw a punch at Del Rio "but appeared to be so intoxicated he actually missed and fell over." When Del Rio tried to help him up, the others "jumped [Del Rio]," "forced him down," and "started punching and kicking him." "They were yelling Checkers and Farside [*sic*]."[3]

At some point, Moro noticed a "Chevy muscle car [with] oversized wheels and rims on it" parked on King Road outside the park. The car caught his attention because it

---

[2]    At trial, the prosecution's gang expert explained that "ODB" is shorthand for a San Jose "tagging crew" known as the Old Dirty Bastards. ODB members identify with the Orioles symbol. They align themselves with Norteños but "tagging crews don't always get along . . . ." "[T]erritory is important . . . ."

[3]    The prosecution's gang expert explained that the "Checkers Mob has a subset of a tagging crew called Far Side."

was "out of the ordinary for people going to the park." It looked like the kind of car that Moro knew by training and experience that Norteños liked to drive. He believed the car was "probably" owned by one of the people who ran off when he arrived. A license plate check revealed that it was registered to Larios.

Later that day, Moro went to check up on Del Rio at the hospital. Del Rio was "appreciative" and "just thanked us for saving his life."

A teenager who was at the park that afternoon saw eight or nine men wearing "various amounts of red" attacking someone on the ground. He did not see their faces. They "scatter[ed]" when the police showed up. A Hispanic man who was involved in the fight came up to the teenager "and said you need to be quiet." "Just, like, back off or they would hurt me."

Cardin was working an adjacent beat that day. He was just a few blocks away from the park and "immediately" responded to Moro's "onview" transmission. Cardin helped Moro take Prado into custody. "And then an individual who was beat up started yelling to me, 'Stop that guy, stop that guy.'" The individual was Del Rio, "and he was pointing northbound on King Road." He gave Cardin "a description clothing-wise . . . ." He "was pretty adamant and he was yelling down the street, 'That's the guy, that's the guy.'" Cardin detained the indicated person and brought him back to where Moro and Del Rio were. Del Rio never told Cardin, "'No, you got the wrong guy, sorry, now that I see him.'"

San Jose Police Sergeant Christina Lacap took a statement from Del Rio at the hospital.[4] He told her that three guys approached him at the park and one of them tipped Del Rio's hat off his head and asked if he was "part of . . . ODB." Del Rio said he did not know what that was and the guy swung at him, missed, and fell down. When Del Rio

---

[4]     The audiotape of the interview was played for the jury and jurors were given transcripts.

4

helped him up, the other two guys "started punching" him. The guy who knocked his hat off was a "good looking" Mexican guy with a short mustache. Another had "long hair" in a "rubber band." He kicked Del Rio. "There was another guy, a darker skinned Mexican guy, really dark skin, short hair." The three were between "25 to 33" years old. "The rest, . . . all I seen was a bunch of fists and kicks." "[T]hey all jumped over the fence" into the skate park and attacked him. They said "like, 'fuck you,' uh 'farside,' and 'checkers.'" "[T]hey just kept going and going until I heard like . . . screeching wheels. I looked up, and there you guys were, and I was like, 'God, thank God.'" When Lacap asked Del Rio if he had seen the people the police stopped, he responded, "Yeah, you got one of them." "I think the one with the short hair, dark kind of, dark skin." "Cause he was still cussing at me, laughing at me, you know when he was walking away." "Was like, 'we got you, punk, we got you, fucking.'"

San Jose Police Detective Melinda O'Neil testified as the prosecution's gang expert. O'Neil had more than 300 hours of formal and on-the-job gang training beyond the basic gang training she received at the academy. She had spent three years on patrol on the east side, which has "much more of a gang problem" than other parts of San Jose. She spent another three years on the violent crimes enforcement team, where she contacted gang members "daily." She spent a year investigating homicides, "many of them gang-related." She joined the gang investigations unit in 2010. She had personally contacted gang members, either formally or informally, "at least 500 times, minimum." At least half of those contacts were not connected to an arrest, and many of the contacts were "just . . . talking to people out on the street." Topics she had discussed with gang members included "[b]asic lingo, hair styles, tattoos, clothing, neighborhoods, rivals, the way that the specific gang operates, signs and symbols, interactions with police, how [gang members] feel about the police, how they feel about other gang members, and so forth." O'Neil belonged to a number of organizations, including the California Gang

5

Investigators Association and the South Bay Gang Alliance, and she attended weekly and monthly intelligence meetings.

O'Neil described the culture and activities of the Norteño gang and its Checkers Mob and Far Side subsets. She explained that Norteños claim Plata Arroyo Park as their territory. The primary activities of the Norteño criminal street gang include "very violent" assaults, robbery, burglary, narcotics dealing, criminal threats, and witness intimidation. She described the "gang code" against snitching. The "number one rule within a gang . . . is do not snitch, do not cooperate with the police. And this applies to everybody, to citizens, to gang members . . . ." The same rules apply inside the jails. A snitch is "the lowest of the low to a gang member." Snitching is punished with violence on the street and inside the jails. O'Neil explained that the adage " 'Snitches get stitches' " is "one of the things I hear constantly."

O'Neil identified three predicate offenses. In January 2011, four Norteños assaulted a suspected Sureño with a baseball bat. In July 2011, two Norteños and a Crip beat and stabbed a 13-year-old boy who happened to be wearing a red belt. In December 2011, two Norteños robbed a student and told him they would beat him up if he told anyone. Certified court records establishing convictions for these crimes were admitted into evidence.

O'Neil opined that Prado was an active participant in the Norteño criminal street gang on November 22, 2012. She based her opinion on the facts of this case, his admissions of gang membership, his wearing of gang clothing, his association with other Norteños, and his prior contacts with law enforcement. O'Neil opined that Larios was also an active participant in the Norteño criminal street gang on November 22, 2012. Her opinion was based on the facts of this case, on his gang clothing and tattoos (which included a "very, very large" "Checkers Drive" tattoo across his back and large "C" and "M" tattoos on his ankles), his association with other Norteños, and his prior contacts with law enforcement.

O'Neil explained that the assault benefitted the Norteño gang because gang members maintain control over their territory through fear and intimidation. Their willingness to commit violence at any time serves as a warning to rivals and perceived rivals, to bystanders, to ordinary citizens, and even to gang members in good standing. It makes the gang stronger by increasing camaraderie and discipline. The assault also benefitted each individual gang member who participated. "[T]heir status is now enhanced within the gang." "[T]hey know who they can count on, who backed them . . . and collectively as a gang they are a stronger gang."

In response to a hypothetical question, O'Neil opined that two gang members who with other gang members assault a man in a public place within the gang's territory while wearing their gang colors and yelling their gang's name commit that crime with the specific intent to promote, further or assist in criminal conduct by gang members. She further opined that "[u]nder that same hypothetical situation," the crime was committed for the benefit of and in association with a criminal street gang. She based her opinions on the reasons earlier described, namely, that gang violence gives the gang control of a specific area, serves as a warning to everyone, builds camaraderie, and "just makes for a very, very strong gang."

Del Rio was in custody when he testified at trial. He acknowledged that he was not eager to appear as a witness. He was "pretty sure" there were gang members in the jail. He knew what a snitch was and that it was "bad" to be labeled a snitch. Snitches "move out of town" for "protection" because "they're afraid" of "repercussions."

Del Rio did not identify Prado and Larios at trial. He testified that he saw no one in the courtroom who participated in the assault. He denied pointing to anyone in the park or telling police that either defendant participated in the beating. He denied telling police that a group of "Northerners" was playing football in the park that afternoon. He said he did not recall the statement he made at the hospital after the attack. He testified that only "one guy" jumped him.

7

Del Rio testified that he was wearing an orange and black "Obey" hat and listening to his iPod when he rode his bike to the park that day. Obey is "some skater dude from San Francisco." Del Rio has never been a gang member. A Hispanic man "about 20" approached him "and . . . pointed at my hat." Del Rio said he did not to recall what the man said about his hat. He "just nodded" at the man, who "threw a punch" at him but missed and fell over. When Del Rio tried to help him up, he "got jumped from behind." "Probably about four or five" people were punching and kicking his face and upper body. He saw "grey sweatpants, black pants, [and] white shirts" but no other colors. He "felt punches and kicks from all over." He heard "'Fuck you, Bitch' [and] things of that nature." He heard someone say "Checkers." The attack lasted at least a minute or two. The attackers ran "in all directions" when the police arrived.

At the close of the prosecution's case, defendants moved for a judgment of acquittal on the assault counts on the ground that the evidence was insufficient to support guilty verdicts. The court denied the motions, explaining that the question of defendants' involvement in the assault was "obviously an issue for the jurors."

After deliberating for about eight hours, the jury returned guilty verdicts on all counts and found the gang allegations true. Defendants were placed on probation as previously described. They filed timely notices of appeal.

## II. Discussion

### A. Aiding and Abetting Instructions

Defendants claim the trial court erred in instructing the jury with CALCRIM Nos. 400 and 401 on aiding and abetting because there was "no evidence" to support those instructions. We disagree.

"It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) Conversely, "[t]he trial court must give instructions on every theory of the case

8

supported by substantial evidence" but "need not give instructions based solely on conjecture and speculation." (*People v. Young* (2005) 34 Cal.4th 1149, 1200 (*Young*).)

"Under California law, a person who aids and abets the commission of a crime is a 'principal' in the crime, and thus shares the guilt of the actual perpetrator." (*People v. Prettyman* (1996) 14 Cal.4th 248, 259 (*Prettyman*).) " '[A]n aider and abettor is a person who, "acting with (1) knowledge of the unlawful purpose of the perpetrator[ ] and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates the commission of the crime." ' [Citation.]" (*People v. Jurado* (2006) 38 Cal.4th 72, 136.) The test is "whether the accused in any way, directly or indirectly, aided the perpetrator by acts or encouraged him by words or gestures." (*People v. Villa* (1957) 156 Cal.App.2d 128, 134.) The question is one of fact. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) The primary actor need not expressly communicate his criminal purpose to the defendant, "since that purpose may be apparent from the circumstances." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531-532 (*Nguyen*).) "Aiding and abetting may be committed 'on the spur of the moment,' that is, as instantaneously as the criminal act itself." (*Id.* at p. 532.) " 'Mere presence at the scene of a crime is not sufficient to constitute aiding and abetting, nor is the failure to take action to prevent a crime, although these are factors the jury may consider in assessing a defendant's criminal responsibility.' " (*People v. Garcia* (2008) 168 Cal.App.4th 261, 272-273.) Other factors include " 'companionship, flight, and conduct before and after the crime.' [Citation.]" (*Id.* at p. 273.)

Here, there was ample nonspeculative evidence that defendants were more than merely present at the scene of the crime. There was testimony that at least six and as many as 10 men participated in the assault. Both officers testified that immediately after the assault, Del Rio was "yelling" and "pointing" to defendants as having participated. Cardin described Del Rio as "pretty adamant" about it. Defendants' clothing matched the general descriptions that Del Rio and the teenager provided. There was evidence to

9

support an inference that defendants were fleeing the scene when they were arrested, including evidence that Larios was walking *away* from where his car was parked. Prado resisted arrest. There was evidence that once defendants were in custody, Del Rio confirmed that Prado was "one of the guys" who jumped him and that Larios was "one of the ones" who punched him. Del Rio never told either officer that they apprehended "the wrong guy." Thus, there was abundant evidence that defendants were principals in the assault. (§ 31; *Prettyman*, *supra*, 14 Cal.4th at p. 259.) It was "apparent from the circumstances" that all of the principals shared the same criminal purpose. (*Nguyen*, *supra*, 21 Cal.App.4th at pp. 531-532.) The only question was whether defendants were direct perpetrators or aiders and abettors or both. On this record, there was evidence to support all three alternatives. Consequently, the trial court was required even in the absence of a request to instruct the jury on aiding and abetting. (*Young*, *supra*, 34 Cal.4th at p. 1201.) It properly did so.

Defendants insist that their assault convictions must be reversed because there was no evidence that either of them was "a *non-perpetrator* aider and abettor." (Italics added.) The argument lacks merit.

"The dividing line between the actual perpetrator and the aider and abettor is often blurred. It is often an oversimplification to describe one person as the actual perpetrator and the other as the aider and abettor. When two or more persons commit a crime together, both may act in part as the actual perpetrator *and* in part as the aider and abettor of the other, who also acts in part as an actual perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1120 (*McCoy*).) In *McCoy,* "[a]lthough Lakey was liable for McCoy's actions, he was an actor too. He was in the car and shooting his own gun, although it so happened that McCoy fired the fatal shots." (*Ibid*.) "In another shooting case, one person might lure the victim into a trap while another fires the gun; in a stabbing case, one person might restrain the victim while the other does the stabbing. In either case, both participants would be direct perpetrators as well as aiders and abettors of the other.

10

The aider and abettor doctrine merely makes aiders and abettors liable for their accomplices' actions as well as their own. It obviates the necessity to decide who was the aider and abettor and who the direct perpetrator or to what extent each played which role." (*Ibid.*)

Here, there was strong evidence that both defendants participated in the assault. Additionally, the circumstances of the group attack supported an inference that defendants and the other participants shared the intent to inflict great bodily injury. (*Nguyen*, *supra*, 21 Cal.App.4th at pp. 531-532.) This was sufficient to support a jury conclusion that defendants were liable as aiders and abettors. The fact that defendants may have punched and/or kicked Del Rio with sufficient force to support a conclusion that they were also direct perpetrators does not preclude a conclusion that they aided and abetted the assault. (*McCoy*, *supra*, 25 Cal.4th at p. 1120.) The roles of aiders/abettors and direct perpetrators are not mutually exclusive. (*Ibid.*)

Defendants' reliance on *People v. Perez* (2005) 35 Cal.4th 1219 (*Perez*) and *People v. Singleton* (1987) 196 Cal.App.3d 488 (*Singleton*) is misplaced. It was error to instruct on aiding and abetting in *Perez* because there was no proof of any criminal act to which the defendant contributed. (*Perez*, at p. 1227.) In *Singleton*, there was "no evidentiary foundation for accomplice liability hinged solely upon the prosecution's theory that defendant aided and abetted an anonymous 'Mr. X.'" (*Singleton*, at p. 493.) By contrast here, there was ample evidence of an assault aided and abetted by numerous participants. *Perez* and *Singleton* are inapposite.

## B. Responses to Jury Questions

Defendants contend that the trial court gave inadequate responses to two questions the jury asked during deliberations. We disagree.

11

### 1. Background

The jury sent the court two notes about aiding and abetting. The first asked, "Is knowingly removing evidence from the scene of the crime considered aiding and abetting the crime?" Counsel for Prado wanted the court to refer jurors to CALCRIM Nos. 400 and 401 "without more" because "the answer is in those instructions." The prosecutor and counsel for Larios agreed with the response the court ultimately gave: "It depends on what you find to be the facts of the case. Please re-read CALCRIM 400 & 401."

The second jury note asked, "Can verbally intimidating the victim immediately after the assault be considered [¶] a. part of the assault? [¶] b. aiding and abetting the assault?" The court had "lengthy discussions" with counsel about this note. Larios's counsel wanted the court to respond with a simple no. The prosecutor and counsel for Prado agreed with the response the court ultimately gave: "Please re-read CALCRIM 400, 401, and 875."

After the verdicts were announced, the court asked the jury several follow-up questions. The foreperson confirmed that defendants were convicted as aiders and abettors. The foreperson also confirmed that the jury unanimously found (1) that a perpetrator committed a crime, (2) that each defendant knew the perpetrator intended to commit the crime, (3) that before or during the commission of the crime, each defendant intended to aid and abet the perpetrator in committing the crime, and (4) that each defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

### 2. Analysis

Prado contends that the court's response to the first jury note erroneously permitted the jury to conclude that "removing evidence from the scene of a completed offense—which must have referred to the testimony that appellant Prado was observed removing jackets from the park after the assault was over—could be a proper factual basis for an aiding and abetting conviction." He maintains that the court should have

responded, "No." This is inconsistent with the "without more" position he urged below. Prado has forfeited the argument he attempts to raise for the first time on appeal. (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 504.) It lacks merit in any event.

"Section 1138 imposes upon the court a duty to provide the jury with information the jury desires on points of law." (*People v. Smithey* (1999) 20 Cal.4th 936, 985.) "This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard are often risky. [Citation.]" (*People v. Beardslee* (1991) 53 Cal.3d 68, 97 (*Beardslee*).) "But a court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least *consider* how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*Ibid*.)

That is precisely what the court did here. The court explained that it had considered a few options, including "giving them the legal answer, which is, yes, it can be considered aiding and abetting. The court considered simply stating, please refer to CALCRIM 400 and 401, which are aiding and abetting instructions." "The court considered responding, 'It depends on what you find to be the facts of the case. Please reread CALCRIM 400 and 401.' The court believed the most prudent path would be to not tip the scales one way or the other and not give them a legal answer, but merely give them an answer that depends on what they find the facts of the case to be." "[I]t depends on [when] the jurors believe . . . the crime began and when it ended." "If they apply CALCRIM 400, 401, which I've already instructed them to do, and, really, if they follow it they will come to the correct determination."

Defendants do not argue that the standard instructions were not full and complete. Thus, we review for an abuse of discretion any error under section 1138. (*Beardslee*,

13

*supra*, 53 Cal.3d at p. 97.) We see no abuse of discretion. We agree with the court's analysis. The response reminded jurors that it was their job to determine the facts. It gave them the legal framework within which to view those facts. CALCRIM No. 401 is a correct statement of the law on aiding and abetting. (*People v. Stallworth* (2008) 164 Cal.App.4th 1079, 1103-1104.) The response to the first jury note was proper.

We reject Prado's alternative contention that his trial counsel was prejudicially deficient in "fail[ing] to ask the court to respond . . . 'No . . . .'" A defendant seeking reversal for ineffective assistance of counsel must prove both deficient performance and prejudice. (*People v. Ledesma* (1987) 43 Cal.3d 171, 218 (*Ledesma*); *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) Here, a "no" response would have been inappropriate because it would have usurped the jury's function to determine the facts. A request for such an instruction would properly have been denied. The failure to make a meritless argument or to request an inappropriate instruction is not deficient performance. (*People v. Prock* (2014) 225 Cal.App.4th 812, 821; *Strickland*, at pp. 687-690.)

Turning to the second jury note, we reject Larios's assertion that the court should have responded with an unequivocal no. Larios's reasoning below was that post-assault conduct cannot support liability for aiding and abetting an assault and in this case, the taunting "clearly" happened "after the assault had occurred." "The victim is on his feet and he's listening to somebody say this." The problem with Larios's reasoning is that the record does not establish that Del Rio was on his feet when the taunting occurred. Nor does it establish when the assault ended. It was the jury's task to determine the factual circumstances, including whether the taunting remark was made, who made the remark, when the assault ended, and whether the remark was made before or after the assault ended. The trial court properly so ruled. We agree with the court's reasoning. As the court explained, "When [the court and counsel] were trying to . . . 'read the tea leaves' . . . , we tried to break it down into question A and then question B and what do

14

they mean by each.  [¶]  Regarding the words . . . 'part of' [in question A] we weren't sure if the jurors were asking for a legal analysis or a factual analysis.  In the end, it's a factual determination by the jurors what is part and parcel of the assault and whether assault was ongoing at that time, meaning the crime of assault with a deadly weapon.  I indicated the court did not want a verdict based upon words alone, but the jurors may not be asking the ultimate [question of] guilt or non-guilt . . . .  They may be simply trying to factor in what they can consider and what they cannot consider when comparing it against all the other evidence."

"Regarding the word . . . 'after' [in question B], we were not sure if the jurors [had] already concluded that the crime had terminated and . . . were asking . . . a follow-up question on the ultimate question of guilt or non-guilt . . . , or whether the jurors were using a common temporal vernacular in forming an everyday question and not delving into the legal meaning.  [¶]  The court was cautious in that [it] did not want to give any answer that would cause them to have a guilty verdict against either defendant, and the court was cautious in that we should take an interpretation that would protect against them solely asking a legal question and me giving the improper answer.  [¶]  I, at one point, suggested to the attorneys, would it be appropriate if the court responded, quote, 'If the words of the defendant came after the jury believed the crime had ended, the defendant would not be guilty under the question as it is posed in [the] jury note number 3.'  Nobody seemed to like that suggestion.  Again, [counsel for Larios] said I just want you to say no and send in one word.  [Counsel for Prado] said I want you to refer to [CALCRIM ] 400 and 401.  [The prosecutor] said the safest thing is to try not to guess what the jurors are asking, but simply to refer them to the jury instructions.  [¶]  We all held up the jury instructions again and reread them, and it is clear that [if] the jurors follow the jury instructions[,] that they will not render an improper verdict applying what they find to be the facts to the law.  It will guide them in their deliberations.  [¶]  So I'm going to adopt the suggestion from [counsel for Prado and from the prosecutor] over

15

[counsel for Larios's] objection. I don't believe it will be legally or factually correct if I told the jurors, quote, 'No' period, close quotes."

The court's response was proper. The parties and the court were not sure precisely what the jurors were asking but all agreed that the standard instructions correctly explained the applicable law. Contrary to Larios's assertion, it was not clear that the taunting occurred after the assault ended. A flat "no" response would have usurped the jury's function to determine the facts. We reject Larios's claim of trial court error.

## C. Confrontation Clause Challenge to Gang Expert's Testimony

Defendants contend that the trial court prejudicially abused its discretion and violated their Sixth Amendment rights to confrontation by allowing O'Neil to recount "testimonial hearsay" as a basis for her opinions that defendants were active gang members when they committed their crimes.

### 1. Background

Defendants moved in limine to preclude O'Neil from "testifying about or relying on any out-of-court statements." They argued that such statements were hearsay or double hearsay, that the statements were "worthless" unless they were true, and that "without hearing live testimony from a witness with personal knowledge of the statements, the jury [could not] possibly determine whether the statements were made." They asserted that admitting such testimony would deprive them of their Sixth Amendment right to confront witnesses against them.

The prosecution responded that controlling California law, specifically Evidence Code section 802 and *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*), permits gang experts to describe the bases of their opinions even when those opinions are based on inadmissible material, that the United States Supreme Court's opinion in *Williams v. Illinois* (2012) __ U.S. __ [132 S.Ct. 2221] (*Williams*) did not change that law, and that

16

any concern that the jury might misuse the expert's testimony could be cured by a limiting instruction.

The trial court agreed with the prosecution. The court analogized the information that gang experts rely on to "raw data" from which they formulate their opinions. The court noted that those opinions "can be examined by all parties." "Moreover, all of the attorneys have the opportunity to impeach the expert by saying . . . , 'You didn't really take that statement, the field identification card,' and she's going to answer, 'That's right.'" The court said it would give a limiting instruction before O'Neil testified.

O'Neil testified that defendants' prior contacts with law enforcement were among the bases for her opinions that they were active gang members on the day of the assault. She was asked if she was "aware" of those prior contacts and said that she was. The record suggests that the information she described came from her review of field interview cards. The trial court instructed the jury that the prior contacts information O'Neil recounted was "not for the truth of the matter asserted in these statements" but merely as a basis for her expert opinion that defendants were active gang members on November 22, 2012.

O'Neil described eight law enforcement contacts with Prado between 2007 and 2012. In 2007, he was interviewed during a vehicle stop in a gang area. He was with two Checkers Mob gang members, and he was wearing red clothing. When he was asked about his gang membership, Prado said he "'just hangs with these guys.'" In September 2007, Prado and a Checkers Mob gang member were contacted in a gang area. Prado was wearing red clothing. When he was asked if he hung out with Norteños, he replied, "I guess." He was released at the scene.

In 2008, Prado was contacted in a gang area. He was wearing red clothing. He admitted that he "'reps'" or represents Norteños. He was released after the interview.

In 2009, Prado was contacted with three Norteño gang members in a gang area. He was released at the scene.

17

In April 2011, a citizen called police and reported that a group of males wearing red clothing was in a parking lot and "at least one of them was bloody." Prado was contacted with other gang members at the scene and released.

In January 2012, Prado was contacted in a gang area with other Norteño gang members. He was released at the scene. In October 2012, someone called police and reported "a disturbance involving a weapon." Prado was contacted with other gang members in a gang area and released at the scene.

O'Neil described four law enforcement contacts with Larios since 2010. Two occurred in 2010, when he was contacted in gang areas with other gang members. Larios was also present during the April 2011 and October 2012 incidents described above.

## 2. Analysis

The confrontation clause of the Sixth Amendment guarantees the accused in all criminal prosecutions " 'the right . . . to be confronted with the witnesses against him.' " (*Crawford v. Washington* (2004) 541 U.S. 36, 42 (*Crawford*).) In *Crawford*, the United States Supreme Court held that the admission of a "testimonial" statement against a criminal defendant by a declarant who is not available at trial violates the confrontation clause unless the defendant had a prior opportunity to cross-examine the declarant. (*Id.* at pp. 68-69.) The court explained that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." (*Id.* at p. 50.)

"[T]he confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984 (*Cage*), citing *Davis v. Washington* (2006) 547 U.S. 813 (*Davis*).) As the court stated in *Crawford* and reaffirmed in *Williams*, "The Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (*Crawford*, *supra*, 541 U.S. at p. 59, fn. 9; *Williams*, *supra*, 132 S.Ct. at pp 2227-2228 (plur. opn. of Alito, J.,

joined by Roberts, C.J., Kennedy & Breyer, JJ.) ["[T]his statement was not admitted for the truth of the matter asserted, and it is settled that the Confrontation Clause does not bar the admission of such statements."].)

Accordingly, the starting point of our analysis is whether O'Neil's testimony was hearsay—that is, "a statement that was made other than by a witness while testifying at the hearing and *that is offered to prove the truth of the matter stated*." (Evid. Code, §1200, italics added.) If the out-of-court statement was offered for its truth, we must then determine whether the statement was "testimonial" hearsay under *Crawford* and its progeny. (See *Williams*, *supra*, 132 S.Ct. at pp. 2242, 2259 [conc. opn. of Thomas, J.].) Here, even if we assume that the information O'Neil recounted from the field interview cards was offered for its truth, the information was not "testimonial" under *Crawford* and its progeny.

Defendants argue, however, that the statements on the cards were testimonial "because they were taken for the purpose of police investigation of gang activity." We disagree.

In *Crawford*, the court expressly declined to provide a comprehensive definition of "testimonial." (*Crawford*, *supra*, 541 U.S. at p. 68.) The court observed that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." (*Ibid.*) The court used the term "interrogation" in its colloquial rather than any technical legal sense, explaining that it did not need to define "interrogation" because the witness's "recorded statement, knowingly given in response to structured police questioning [when she was in police custody, herself a potential suspect in the case], qualifie[d] under any conceivable definition." (*Id.* at p. 53, fn. 4.)

The California Supreme Court has explained that "a statement is testimonial when two critical components are present." (*People v. Lopez* (2012) 55 Cal.4th 569, 581-582 (*Lopez*); *People v. Dungo* (2012) 55 Cal.4th 608, 622 (*Dungo*).) First, "the out-of-court

19

statement must have been made with some degree of formality or solemnity." (*Lopez*, at p. 581.) "Second, . . . an out-of-court statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution . . . ." (*Lopez*, at p. 582.) "The more a statement resembles the ' "solemn declaration or affirmation" ' that is testimony, commonly understood, and the more it was expected, when made, ' "to be used prosecutorially" . . . "at a later trial," ' the more centrally it is located within the 'core class of "testimonial" statements.' [Citation.]" (*Dungo*, at p. 622.)

Here, even if the information on the cards was admitted for its truth, it would not qualify as testimonial. O'Neil described a field interview card as "a small piece of paper" on which officers can write observations when they contact somebody in the field. She explained, "I can write down their name and birthday," along with any observations (such as gang tattoos, gang clothing, or frequenting a gang area) that suggest the individual is a gang member. The field interview cards are saved in the department's records division, "maybe never [to] be looked at again." They may, however, become relevant "sometime in the future."

We do not think these field interview cards or the information that O'Neil derived from them qualify as "testimonial." First, the requisite "formality" and "solemnity that characterizes testimony by witnesses" are missing. (*Cage*, *supra*, 40 Cal.4th at p. 987.) The contacts here occurred in the field in relatively informal settings. The contacting officers' observations about where and with whom defendants were contacted, what they were wearing, and what they may have said were handwritten on "a small piece of paper" after each contact. Those small pieces of paper are nothing like the "recorded statement" that was "knowingly given in response to structured police questioning" by the custodial witness in *Crawford*. (*Crawford*, *supra*, 541 U.S. at pp. 53, fn. 4.) They bear no resemblance to "the ' "solemn declaration or affirmation" ' that is testimony, commonly understood." (*Dungo*, *supra*, 55 Cal.4 at p. 622.)

20

Second, nothing in the circumstances of the contacts objectively suggests that the primary purpose of the observations written on the field interview cards was prosecutorial. (*Davis*, *supra*, 547 U.S. at p. 822; see *Dungo*, *supra*, 55 Cal.4th at p. 622 [conc. opn. of Werdegar, J., joined by Cantil-Sakauye, C.J., Baxter, and Chin, JJ.].) Defendants were not targeted as suspects in any crimes when the contacts occurred, and they were released at the scene after the field interviews. This suggests to us that the primary purpose of the field interview cards was information-gathering. O'Neil testified that she made it her "everyday mission" to contact gang members and to get intelligence from them. "I will discuss everything with gang members. As much as they will divulge I will listen to." O'Neil said that she talked to other officers "daily" about gangs "to disseminate that information and intelligence." We assume that her fellow officers similarly gathered and disseminated general information about gangs, for the simple reason that "[d]ay in and day out such information would be useful to the police as part of their general community policing responsibilities quite separate from any use in some unspecified criminal prosecution." (*People v. Valadez* (2013) 220 Cal.App.4th 16, 36 (*Valadez*).) The fact that O'Neil used the information years later when she testified as a gang expert "does not mean [that the officers'] *primary purpose* in obtaining this information was to use it against [defendants] in a later criminal prosecution." (*Ibid.*) We conclude that even if the information on the field interview cards was admitted for its truth, it was not testimonial. Its admission did not violate the confrontation clause.

## D. Alleged Improper Expert Opinion as to Guilt

Defendants claim the trial court improperly permitted O'Neil to opine that they committed the assault " 'in association with' " and " 'for the benefit of' " a criminal street gang. They assert (1) that the prosecutor's question "directly contravened" a pretrial ruling, (2) that the challenged testimony was "tantamount to directing a verdict of guilty" on the assault counts because it identified defendants as participants in the attack, and (3)

21

that the challenged testimony was an improper opinion as to their states of mind at the time of the alleged crimes.

### 1. Background

At the in limine hearing, the trial court noted defense counsel's agreement that if one of them objected, it would be adopted by the other "throughout the trial so they don't have to talk on top of each other. . . . [T]hat's acceptable to the court." The court also granted a defense motion that "[i]nsofar as the court overrules any of the defense's in limine motions, . . . the objection be preserved for appeal without the defense being required to renew the objection at the time the disputed evidence is actually admitted or presented to the jury."

The defense moved in limine to preclude any witness from testifying that the assault occurred in association with, at the direction of, or for the benefit of a criminal street gang, asserting that this was "the ultimate issue of fact to be decided by the jury" and that "[a]llowing the prosecution to pose this question to a witness would usurp the jury's role as fact-finder, in violation of the Sixth and Fourteenth Amendment rights to a fair trial." The prosecutor responded that he was entitled to ask O'Neil whether she believed defendants' conduct was gang related, and that he would couch any questions about specific intent as hypotheticals. The court ruled that the prosecutor's approach was "acceptable" and "standard practice."

Prado's counsel made an oral in limine motion to bifurcate trial of the gang allegations. He expressed concern that O'Neil's testimony "could be used by the jurors as improper character evidence for the issue . . . whether or not [Prado] is the person who committed the crime . . . ." Larios joined in the motion, which the court denied.

At trial, the prosecutor asked O'Neil, "In your expert opinion, did the defendants . . . commit these felonies in association with a criminal street gang?" Neither defendant objected. O'Neil responded, "Yes." In response to a follow-up question, O'Neil explained that "[i]n association with, it's as simple as the fact that they are both

22

Norteño criminal street gang members, and they were together when they committed this crime." The questioning continued as follows. "[Prosecutor]: "Do you believe that other Norteño gang members were involved? [¶] "[O'Neil]: I do. [¶] "[Prosecutor]: And why commit crimes in groups? [¶] "[O'Neil]: As I've stated many times before, there's great strength in numbers. Had it been one-on-one with this incident I don't know that that individual could have pulled off that kind of assault on the victim. [¶] As far as gangs are concerned with the numbers, it also provides an enhanced status for the individuals within the gang. It makes them credible when they are talking about it later. They don't have to worry about, maybe, others snitching so much because they all did the crime together."

The prosecutor then asked, "In your expert opinion, did the defendants . . . commit the felony for the benefit of the Norteño criminal street gang?" Neither counsel objected, but Prado's counsel asked for a bench conference. Two bench conferences followed. Neither one was reported. The prosecutor then repeated the question he asked before the unreported conferences. "In your expert opinion, did the defendants . . . commit these felonies for the benefit of the Norteño criminal street gang?" O'Neil responded, "Yes." Neither defense counsel objected. The record discloses no motion to strike O'Neil's testimony, no request for a curative instruction, and no motion for a mistrial.

The prosecutor then asked O'Neil how the conduct in this case benefited the gang, how it benefited the gang members who participated in the assault, whether "saying something" to the victim before an attack was "typical Norteño behavior," and what the purpose of such a statement was. He then asked, "If two gang members with other gang members, while in a public place within their gang's territory, assault a man while wearing their gang colors, yelling their cliques [sic] or territory's name, in your expert opinion was that crime committed with the specific intent to promote or further or to assist in any criminal conduct by gang members?" O'Neil responded, "Yes." She explained that "[f]or the same [reasons] as I mentioned earlier, it comes down to the

23

territory and the control of a specific area. And it's done through fear, intimidation, and violence. And this violence serves as a warning to everyone that saw it and word definitely spreads. The violence, the intimidation that was also conducted on a bystander, the threats, it just makes for a very, very strong gang. And again, it builds camaraderie and makes them more powerful in their own minds." The prosecutor asked, "Under that same hypothetical situation in your opinion, would that be done for the benefit of and in association with a criminal street gang?" O'Neil responded, "Yes."

### 2. Analysis

"It has long been settled that expert testimony regarding whether a crime was gang related is admissible." (*People v. Vang* (2011) 52 Cal.4th 1038, 1050, fn. 5 (*Vang*).) "It has also long been settled that expert testimony generally, and expert testimony regarding whether a crime is gang related specifically, may be given in response to hypothetical questions. [Citations]." (*Ibid*.) The hypothetical " 'must be rooted in facts shown by the evidence . . . .' " (*Vang*, at pp. 1045-1046.) "Hypothetical questions must not be prohibited solely because they track the evidence too closely, or because the questioner did not disguise the fact the questions were based on the evidence." (*Vang*, at p. 1051.) But it is generally improper for an expert to opine that a specific defendant "had specific knowledge or possessed a specific intent."[5] (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 658, disapproved on a different ground in *Vang*, at p. 1045.) "[T]he reason for this rule is *not* that such testimony might embrace the ultimate issue in the case. 'Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.' [Citations.] Rather, the reason for the rule is similar to the reason expert testimony regarding the defendant's

---

[5] The California Supreme Court has stopped short of condemning such questions in all circumstances. (See *Vang*, *supra*, 52 Cal.4th at p. 1048, fn. 4, citing *People v. Valdez* (1997) 58 Cal.App.4th 494, 507 (*Valdez*); see also *People v. Prince* (2007) 40 Cal.4th 1179, 1227 [citing *Valdez* with approval].)

guilt in general is improper . . . . ' "[O]pinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact . . . . [T]he trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." ' [Citations.]" (*Vang*, at p. 1048.)

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion." (Evid. Code, § 353.) " 'Specificity is required both to enable the court to make an informed ruling on the motion or objection and to enable the party proffering the evidence to cure the defect in the evidence.' " (*People v. Boyette* (2002) 29 Cal.4th 381, 424.) " ' "[Q]uestions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal. [Citation.]" ' [Citations.]" (*People v. Williams* (2008) 43 Cal.4th 584, 620.) An objection to an in limine ruling admitting evidence is usually insufficient to preserve the objection for appeal if the objection is not repeated when the evidence is offered. (*People v. Morris* (1991) 53 Cal.3d 152, 190 (*Morris*), disapproved on another point in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) A motion in limine to exclude evidence will preserve an objection for appeal notwithstanding a failure to object when the evidence is offered when "(1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context." (*Morris*, at p. 190; *People v. Navarette* (2003) 30 Cal.4th 458, 491.)

At the outset, we reject defendant's contention that the prosecutor's question "directly contravened" a pretrial ruling. Their failure to object on that ground below has

25

forfeited any claim of prosecutorial misconduct on appeal. (*People v. Earp* (1999) 20 Cal.4th 826, 858-859.)

Defendants suggest that their in limine motions preserved their other arguments for appeal, namely, their claim that the challenged testimony was "tantamount to directing a verdict of guilty" on the assault counts because it identified defendants as participants in the attack, and their claim that the challenged testimony was an improper opinion as to their states of mind at the time of the alleged crimes. It is unclear whether a blanket motion to bifurcate all gang evidence preserves a later objection that an expert's opinion was improperly admitted in response to an inartfully-worded question. That is particularly so here, where the claimed error could easily have been corrected had defendants raised a timely objection either to the prosecutor's question or to O'Neil's response. (See *People v. Partida* (2005) 37 Cal.4th 428, 434.)

Defendants failure to provide an adequate record for review presents an additional complication. "It is axiomatic that it is the burden of the appellant to provide an adequate record to permit review of a claimed error, and failure to do so may be deemed a waiver of the issue on appeal. [Citations.]" (*People v. Akins* (2005) 128 Cal.App.4th 1376, 1385 (*Akins*).) Here, the record reflects a bare request for a bench conference. That bench conference was unreported. It was followed by another bench conference. It too was unreported. Thus, we have no way of knowing what was discussed at either conference. We do not know the precise ground of any objection. We do not know if defense counsel moved to strike O'Neil's testimony. We do not know whether counsel requested a curative instruction. We do not know if counsel moved for a mistrial. We have no idea how the trial court ruled. Defendants' failure to provide an adequate record has forfeited their arguments on appeal. (*Ibid.*)

On the record we have before us, any error was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); see *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 76 [claim that witness "gave inadmissible opinion testimony on the central

question of . . . guilt and thereby violated [the defendant's] constitutional rights . . . is, in substance, one of erroneous admission of evidence, subject to the standard of review for claims of state law error."].) To the extent that O'Neil's responses constituted an improper opinion about defendants' guilt as defendants contend, no reasonable juror would have credited that opinion. O'Neil testified that she was not at Plata Arroyo Park that Thanksgiving. She told the jury that she did not know "exactly what happened out there." She never went to the scene that day to assist officers involved in the investigation. When she was asked if she saw who assaulted Del Rio that afternoon, she replied, "Absolutely not." The jury was instructed that it had to decide whether information on which O'Neil relied was true and accurate, that it was not required to accept her opinions as correct, and that it could disregard any opinions it found unreasonable or unsupported by the evidence. "We presume that jurors are intelligent and capable of understanding and applying the court's instructions. [Citation.]" (*People v. Butler* (2009) 46 Cal.4th 847, 873.)

We reach a similar conclusion with respect to defendants' contention that O'Neil improperly gave an opinion as to their states of mind at the time of the crimes. Even if we assume that they preserved the issue and further assume that they provided an adequate record, any error was harmless. There was ample properly-admitted evidence that the assault was gang-related. It occurred in Plata Arroyo Park, which O'Neil testified was claimed by Norteños as their territory. Del Rio referred to his assailants as "Norteños." There was testimony that his assailants wore gang colors and that they yelled "Checkers" and "Farside" during the assault. There was evidence that they threatened to hurt the teenager if he did not keep quiet. O'Neil explained in detail how such actions benefit the gang in general and gang members in particular. On this record, it is not reasonably probable that a result more favorable to defendants would have been reached in the absence of the claimed errors. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

27

## E. Probation Conditions

Defendants challenge several probation conditions as unconstitutionally overbroad and/or unreasonable.

A trial court has broad discretion to impose such reasonable probation conditions "as it may determine are fitting and proper to the end that justice may be done . . . and generally and specifically for the reformation and rehabilitation of the probationer . . . ." (§ 1203.1, subd. (j).) "A condition of probation will not be held invalid unless it '(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality . . . .' [Citation.]" (*People v. Lent* (1975) 15 Cal.3d 481, 486 (*Lent*).) "The [*Lent*] test is clearly in the conjunctive, that is, the three factors must all be found to be present in order to invalidate a condition of probation." (*People v. Balestra* (1999) 76 Cal.App.4th 57, 65, fn. 3; see *Lent*, at p. 486, fn. 1.)

" '[P]robation is a privilege and not a right, and . . . adult probationers, in preference to incarceration, validly may consent to limitations upon their constitutional rights . . . . [Citations.]' [Citation.]" (*People v. Leon* (2010) 181 Cal.App.4th 943, 948.) But "[a] probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad." (*In re Sheena K.* (2007) 40 Cal.4th 875, 890.)

Generally, we review the imposition of a probation condition for abuse of discretion. (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1121.) "However, we review constitutional challenges to a probation condition de novo." (*In re Shaun R.* (2010) 188 Cal.App.4th 1129, 1143.)

### 1. Passwords Condition

Defendants challenge probation conditions requiring (1) that they "shall provide all passwords to any electronic devices (including cellular phones, computers or

28

notepads) within [their] custody or control and shall submit said devices to search at anytime [*sic*] without a warrant by any peace officer" and (2) that they "shall provide all passwords to any social media sites (including [F]acebook, [I]nstagram and [M]ocospace) and shall submit said sites to search at anytime [*sic*] without a warrant by any peace officer." Defendants maintain that the password conditions are unreasonable under *Lent* and infringe on their constitutional rights to privacy and freedom from unreasonable search and seizure. We disagree.

This court rejected a reasonableness challenge to the identical password conditions in *People v. Ebertowski* (2014) 228 Cal.App.4th 1170 (*Ebertowski*).) The court reasoned that "[t]he evident purpose of the password conditions was to permit the probation officer to implement the search, association, and gang insignia conditions that were designed to monitor and suppress defendant's gang activity. Without passwords for defendant's devices and social media accounts, the probation officer would not be able to search them under the unchallenged search condition in order to assess defendant's compliance with the unchallenged association and gang insignia conditions. Defendant does not suggest how the password conditions could be more closely tailored to this purpose, and we can conceive of no adequate restriction that would still serve this purpose. Access to all of defendant's devices and social media accounts is the only way to see if defendant is ridding himself of his gang associations and activities, as required by the terms of his probation, or is continuing those associations and activities, in violation of his probation." (*Id.* at p. 1175.)

The same reasoning applies here. Here as in *Ebertowski*, the trial court imposed search, gang association, and gang insignia conditions that defendants did not challenge below and do not challenge on appeal. Defendants' probation officers cannot fully monitor defendants' compliance with those conditions without passwords to defendants' electronic devices and social media accounts. (*Ebertowski*, *supra*, 228 Cal.App.4th at p. 1175.) Access to all of their devices and social media accounts is the only way to

29

monitor whether defendants are ridding themselves of their gang associations and activities, as required by the terms of their probation, or continuing those associations and activities, in violation of probation.

We reject defendants' assertion that the password conditions are unreasonable because there was insufficient information to justify their imposition. O'Neil testified at trial that gang violence was "glamorized" through music, tattoos, clothing, and the Internet. "We see a lot of gang activity online now. Facebook, MySpace. Facebook is huge right now. A lot of pictures on Facebook." "These people on . . . social media are highly connected, hundreds and hundreds, many of them associates." They may not even know each other, "but because they all have the Northern movement in common they are all Facebook friends." There was testimony that gang-related photos were found on Prado's cell phone. In imposing the password conditions, the court explained that "in general, it is known that gangs use smart phones, the Internet, social media, [and] electronic devices to further their gang activity." The court observed that the purpose of the photos of Prado "wearing the colors, wearing the name Checkers, wearing the obvious gang regalia" was "obviously [to say] 'I am a gang member' as opposed to 'I am at a birthday party' . . . . [I]t's obvious that it was for the purpose of furthering the gang . . . sharing the photos with others and whoever took the photo. And it's just something we see a lot of these days because this is the new way of communication. And so I think it's appropriate for probation to be in tune with this modern form of communication and to give guidance and help gang members not be gang members through having such a condition." We conclude that imposition of the password conditions was reasonable.

Defendants contend that the password conditions violate their constitutional right to privacy. We disagree.

"[A] person subject to a search condition has a severely diminished expectation of privacy over his or her person and property." (*People v. Robles* (2000) 23 Cal.4th 789,

30

798.)  "Even where there is '(1) a legally protected privacy interest; (2) a reasonable expectation of privacy under the circumstances; and (3) conduct constituting a serious invasion of the privacy interest,' the constitutional right to privacy is not violated if 'the invasion of the privacy interest is justified because it substantially furthers one or more legitimate competing or countervailing privacy or non-privacy interests.'  [Citation.]" (*Ebertowski*, *supra*, 228 Cal.App.4th at p. 1176.)

Here, the password conditions enable defendants' probation officers to enforce the search, association, and gang insignia conditions that defendants have not challenged. The competing interest is the state's interest in preventing defendants from continuing their violent gang associations and activities.  (*Ebertowski*, *supra*, 228 Cal.App.4th at p. 1176.)  Defendants' gang involvement caused them to join with other gang members to commit an unprovoked and very violent assault on a non-gang member who was innocently enjoying an afternoon at the park.  Defendants assaulted Del Rio in broad daylight on a Thanksgiving afternoon, when the park was full of "people on their bikes, on their skateboards, [and] families . . . ."  The assailants ignored the arrival of the police until Moro drove his patrol car over the curb and onto the grass.  Prado later ignored Moro's repeated commands to stop, and when Moro pulled his gun, Prado "started taking off his jacket and punching out his fists and took a combative stance" as if to challenge him.  Such persons pose an extreme danger to public safety.  Here, the invasion of privacy caused by defendants' probation officers monitoring their use of electronic devices and social media accounts while they remain on probation is outweighed by the state's interest in protecting the public from dangerous gang members who have been granted the privilege of probation.  (*Ebertowski*, at p. 1176.)

Defendants contend that the password conditions must be stricken because the state's interest in preventing future gang activity is adequately protected by the other gang conditions that the court imposed.  The contention lacks merit.  We have already determined that the password conditions are the only way defendants' probation officers

31

can adequately monitor defendants' compliance with other conditions aimed at suppressing defendants' gang associations and activity. (*Ebertowski*, *supra*, 228 Cal.App.4th at p. 1175.) The password conditions are the only way the probation officers can fully monitor defendants' compliance with the terms of their probation. (*Ibid.*)

Larios argues that *Ebertowski* is distinguishable because the trial court in that case received specific information that the defendant had historically used social media sites to promote his gang. He claims that the conditions in this case were supported by "mere speculation," which is not enough to support the government's interference with his substantial rights. We cannot agree that imposition of the conditions here was based on mere speculation, and we have already concluded that the invasion of defendants' privacy while they remain on probation is outweighed by the state's strong interest in protecting the public.

Prado argues that *Ebertowski* was wrongly decided "because it unreasonably permits a massive intrusion into the personal privacy of all probationers and those with whom they associate." His reliance on *California v. Riley* (2014) __ U.S. __ [134 S.Ct. 2473] (*Riley*) is misplaced. The *Riley* court concluded that the warrantless search of two arrestees' cell phones violated their Fourth Amendment right to be free of unreasonable searches and seizures. (*Id.* at p. __ [134 S.Ct. at p. 2485].) Prado did not challenge the police search of his cell phone (which was done pursuant to a search warrant) or the admission of the photos on Fourth Amendment grounds at trial. Nor does he raise any such challenge here. Defendants' challenge is to the imposition of probation conditions. *Riley* says nothing about the search of a probationer's cell phone pursuant to a condition of his probation.

Defendants assert that the password conditions violate the Fourth Amendment. We disagree. " 'The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is

needed for the promotion of legitimate governmental interests." [Citations.]'" (*People v. Sanders* (2003) 31 Cal.4th 318, 333.) We have already determined that the password conditions are reasonable and that the state's legitimate interest in protecting the public outweighs the intrusion of defendants' privacy interests while they remain on probation.

## 2. No-Alcohol Condition

The trial court imposed a probation condition that defendants "shall not possess or consume alcohol or illegal controlled substances or knowingly go to places where alcohol is the [primary] item of sale" as unreasonable. Defendants challenge the condition as unreasonable. They forfeited this claim by failing to raise it below. (*People v. Welch* (1993) 5 Cal.4th 228, 237 (*Welch*).) Recognizing this, they argue that their trial counsel rendered ineffective assistance. We disagree.

A defendant seeking reversal for ineffective assistance of counsel must prove both deficient performance and prejudice. (*Ledesma*, *supra*, 43 Cal.3d at p. 218; *Strickland*, *supra*, 466 U.S. at p. 687.) The first element "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (*Strickland*, at p. 687.) The court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct." (*Id.* at p. 690.) "Judicial scrutiny of counsel's performance must be highly deferential" and "every effort [must] be made to eliminate distorting effects of hindsight . . . ." (*Id.* at p. 689.) When counsel's conduct can reasonably be attributed to sound strategy, a reviewing court will presume the conduct was the result of a competent tactical decision, and the defendant must overcome that presumption to establish ineffective assistance. (*Ibid.*) "'[If] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected." (*People v. Wilson* (1992) 3 Cal.4th 926, 936.) A court deciding an ineffective assistance claim does

not need to address the elements in order, or even to address both elements if the defendant makes an insufficient showing on one. (*Strickland*, at p. 697.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*Ibid.*)

Defendants cannot show deficient performance here, because defense counsel could reasonably have decided that an objection to the no-alcohol condition would have been unsuccessful. The record reflects that at least 20 Norteños were at Plata Arroyo Park that afternoon for a barbecue and football game and that the assault occurred toward the end of or after the game. Moro testified that an eyewitness told him people were throwing full beer cans at Del Rio before the assault. Moro also testified that there were "a bunch of beer cans" in the area where the group had been playing football. Del Rio told police that the man who asked if he claimed ODB and then threw a punch at him "appeared to be so intoxicated [that] he actually missed and fell over." Moro testified that 36 grams of marijuana were found in one of the jackets in Prado's possession. This evidence suggests that alcohol consumption contributed to the attack.

Further, Larios told the probation officer that he smoked marijuana and that he drank alcohol on occasion, typically "a few beers" at "events." Prado told the probation officer that he " 'occasionally' " smoked marijuana " 'on weekends' " and that he drank alcohol "to get 'a buzz' " on social occasions at games and sporting events. On this record, defense counsel could have made a tactical decision not to object to the no-alcohol condition. This was not deficient performance. (*Strickland*, *supra*, 466 U.S. at p. 689.) Defendants' trial counsel did not render ineffective assistance. Their challenge to the no-alcohol condition fails.

### 3. School-Access Condition

Defendants challenge the probation condition that "defendant shall not knowingly be on or within 50 feet of any school campus during school hours unless he/she is enrolled or with prior permission of the school administrator or probation." They argue

that the condition should be stricken because it is an unreasonable requirement that "has no nexus with the offense" and serves no rehabilitative purpose.

Prado failed to object to this condition below. He has forfeited his appellate challenge. (*Welch*, *supra*, 5 Cal.4th at p. 237.) To the extent he claims that his trial counsel rendered ineffective assistance in failing to object, we reject the contention because counsel could have made a rational tactical decision not to object. The record of the sentencing hearing reflects that the prosecutor strongly urged that the case was "a prison case." The trial court noted that "[t]he probation officer was on the fence about whether it should be a prison case" and was "seriously" considering four years in prison. Given the seriousness of the prosecutor's argument and the relatively minor inconvenience that the school-access condition would cause, Prado's trial counsel could reasonably have decided to focus his arguments on avoiding imposition of a long prison sentence and on challenging only the more restrictive password conditions. This was a strategy decision, not deficient performance. (*Strickland*, *supra*, 466 U.S. at p. 689.) Prado's challenge to the school-access condition fails.

Larios did not forfeit his challenge to the condition. He argued below that the condition should not be imposed on him "because he has three small children [and it] would make it kind of impractical for him not to be allowed within 50 feet of a school campus." The trial court responded that Larios could obtain permission to go to his children's schools and that the condition was "intended to keep him from other school campuses." The court did not explain how imposition of the condition related to the crime or to Larios's future criminality. (See *Lent*, *supra*, 15 Cal.3d at p. 486.) We do not think it does. The assault did not occur on or near a school campus. Nothing in the record suggests that the assailants were school-aged. Moro estimated that they were in their "late teens to early 20's." Larios was 25 years old at the time of the crime. Prado was 27. Victim Del Rio was 33. The act of visiting a school campus is not in itself

35

criminal.  (See *Lent*, at p. 486.)  We conclude that the school-access condition was unreasonably imposed on Larios.  The condition must be stricken.

### 4.  Substance Abuse Treatment Condition

Larios challenges the probation condition that he "shall enter and complete a substance abuse treatment program as directed by the Probation Officer."  He argues that the alcohol and substance abuse treatment conditions "serve no rational basis" because the assault "had nothing to do with alcohol and/or drug consumption" and his admitted alcohol use is "quite modest."  He forfeited this contention by failing to object below. (*Welch*, *supra*, 5 Cal.4th at p. 237.)

To the extent Larios contends that his trial counsel's failure to object constituted ineffective assistance, we disagree.  In our view, Larios's trial counsel could reasonably have decided not to object to this condition for the same reason he decided not to object to the no-alcohol condition.  Contrary to Larios's assertion, there was ample evidence that alcohol and/or drug consumption contributed to the gang assault on Del Rio. Further, Larios told the probation officer that he continued to smoke marijuana, although his medical marijuana card had expired a year earlier.  On this record, his trial counsel could have made a tactical decision that an objection to the substance abuse treatment condition would not have succeeded.  This was not deficient performance.  (*Strickland*, *supra*, 466 U.S. at p. 689.)  Larios's challenge to the substance abuse treatment condition fails.

### III.  Disposition

The order of probation as to Prado is affirmed.

The order of probation as to Larios is modified to delete the school-access condition.  As modified, the order is affirmed.

36

_____
Mihara, J.

WE CONCUR:


_____
Bamattre-Manoukian, Acting P. J.



_____
Márquez, J.




*People v. Prado, et al.*
H039931